# United States Court of Appeals
## For the Eighth Circuit
_____

No. 18-1095
_____

E. D., a Minor, by and through his Parents and Next Friends Anthony Dougherty and Katherine D. Dougherty; Anthony Dougherty, individually and as Parent of E.D.; Katherine D. Dougherty, individually and as Parent of E.D.

*Plaintiffs - Appellants*

v.

Palmyra R-I School District

*Defendant - Appellee*

_____

Appeal from the United States District Court
for the Eastern District of Missouri - Hannibal

_____

Submitted: September 26, 2018
Filed: January 3, 2019

_____

Before SMITH, Chief Judge, MELLOY and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

At issue here is what parents must do if they decide to sue a school district after refusing special-education services for their child under the Individuals with Disabilities Education Act ("IDEA"). Even if they bring a lawsuit under a different disability-discrimination law, we conclude that they still must exhaust their administrative remedies if the relief they seek is "also available" under the

IDEA. 20 U.S.C. § 1415(*l*). Accordingly, we affirm the district court's[1] grant of summary judgment to Palmyra R-I School District.

I.

E.D. has Down Syndrome. Before he began kindergarten at Palmyra Elementary School, his mother informed the school that she was seeking accommodations for his disability. E.D.'s parents had some specific accommodations in mind, though, and made clear that they wanted E.D. placed in a regular classroom without special-education instruction.

They sought what they referred to as a "section 504 plan"—after section 504 of the Rehabilitation Act—which would have provided E.D. with some of the educational accommodations otherwise available under the IDEA but without the specialized classes. All they wanted was for E.D. to be able to use an iPad "to compensate for his speech and fine motor delays" and for his teachers to integrate his iPad into their lessons.

The negotiations between E.D.'s parents and the school lasted for approximately a year. Twice the school offered an IDEA plan—more commonly known as an Individualized Education Program or "IEP"—instead of the section 504 plan his parents envisioned. The IEPs would have provided all the iPad-related accommodations his parents sought but would have required him to attend special-education classes. E.D.'s parents rejected both IEPs. The second time, they reiterated their desire for a section 504 plan. Palmyra again refused, and with no resolution in sight, E.D.'s parents pulled him out of school just two weeks after he started first grade.

Not long thereafter, the dispute landed in court. E.D.'s parents sued and alleged that Palmyra had violated section 504 of the Rehabilitation Act, Title II of

---

[1] The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

the Americans with Disabilities Act, and the Fourteenth Amendment to the United States Constitution.  At the heart of their lawsuit was the claim that, by failing to provide educational accommodations, Palmyra had denied E.D. "access to a free public education."

In their complaint, E.D.'s parents sought what they had all along: for E.D. to use an iPad to complete his classroom assignments and for his teachers to adapt their teaching methods to incorporate it.  They also requested additional accommodations, including a change to the school's testing formats to account for E.D.'s "speech [and] fine motor issues" and more time for him to complete his "assignments, tests[,] and homework."

Palmyra moved for summary judgment on the theory that E.D.'s parents had failed to exhaust the IDEA's administrative procedures.  Even though E.D.'s parents had neither sued nor accepted services under the IDEA, Palmyra claimed that they were still required to exhaust their administrative remedies because they were seeking "relief that is also available under [the IDEA]."  20 U.S.C. § 1415(*l*). E.D.'s parents viewed their refusal to accept services as a total opt-out, excusing any failure to comply with the IDEA's procedural requirements.  The district court disagreed and granted summary judgment to Palmyra.  We now review de novo whether E.D.'s parents had to exhaust their administrative remedies before suing. *Nelson v. Charles City Cmty. Sch. Dist.*, 900 F.3d 587, 591 (8th Cir. 2018).

II.

The IDEA requires schools receiving federal funds to provide a "free appropriate public education" to all children who have qualifying disabilities.  20 U.S.C. § 1412(a)(1)(A).  Because parents and schools do not always agree about the best way to provide a child with a free appropriate public education, "the IDEA establishes formal procedures for resolving disputes."  *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 749 (2017).  Included among them are a "due process hearing" before an impartial official and, in certain circumstances, an appeal to a

state agency. 20 U.S.C. § 1415(f)(1)(A), (g)(1). Only after parents have exhausted these administrative procedures can they sue in court. *Id.* § 1415(i)(2)(A).

Other federal laws, including the Americans with Disabilities Act and section 504 of the Rehabilitation Act, also protect children with disabilities from discrimination at school. Although these laws focus more broadly on ensuring "non-discriminatory access to public institutions," to the extent the discrimination occurs in schools, "[t]he same conduct [can] violate all three statutes." *Fry*, 137 S. Ct. at 756; *see also id.* at 749–50. The IDEA itself recognizes that parents may pursue relief under multiple statutes, but it requires parents to exhaust their administrative remedies first. *See id.* at 750. Specifically, it provides that

> [n]othing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, [or section 504] of the Rehabilitation Act of 1973, . . . except that before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative procedures] shall be exhausted to the same extent as would be required had the action been brought under [the IDEA].

20 U.S.C. § 1415(*l*).

The complaint in this case includes only claims expressly listed in the first half of the statute, so all that is in dispute here is the second half, and specifically whether the relief sought "is also available" under the IDEA. E.D.'s parents would have us recognize a categorical exception to the exhaustion requirement for parents who refuse all IDEA services. We decline to do so.

Section 1415(*l*)'s plain language precludes the exception they seek. All parents, not just those who have previously sought or accepted IDEA services, must exhaust the IDEA's administrative procedures if the relief they seek "is also available under" the IDEA.

-4-

We have little trouble concluding that the relief E.D.'s parents seek is available under the IDEA. IDEA exhaustion, as the Supreme Court has recently made clear, "hinges on whether a lawsuit seeks relief for a denial of a free appropriate public education." *Fry*, 137 S. Ct. at 754. If it does, then exhaustion must occur first. *Id.* If, however, the lawsuit seeks relief "for simple discrimination," only tangentially related to education because the discriminatory acts just happened to take place in a school, then exhaustion is unnecessary. *See id.* at 754–56 (explaining that a "simple discrimination" claim would include "a wheelchair-bound child [who] sues his school for discrimination . . . because the building lacks access ramps").

"[A] pair of hypothetical questions" is critical to determining whether the "gravamen" of the complaint is "the denial of a free appropriate public education":

> First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance? . . . [W]hen the answer [to both questions] is no, then the complaint probably does concern a [free appropriate public education], even if it does not explicitly say so . . . .

*Id.* at 754, 756; *see also Nelson*, 900 F.3d at 592 (stating that these hypothetical questions are fact-intensive and should not be "approach[ed] . . . at a high[] level of generality").

In this case, the answer to both questions is no. E.D. and his parents could not have sued a public theater, public library, or any other public facility for any of the relief they seek—whether it is greater incorporation of his iPad into the classroom or additional time to complete his assignments. *Cf. Fry*, 137 S. Ct. at 756–56 (explaining that "a student with a learning disability" who alleged that his school discriminated against him by "failing to provide remedial tutoring in mathematics" would be seeking relief for the denial of a free appropriate public

education). Nor could any of the claims have been brought by a visitor or employee of the school. E.D.'s parents should have, in other words, exhausted.

It makes no difference that they refused all services under the IDEA. Opting out of IDEA services does not unlock a pathway around exhaustion. Indeed, the statute on which E.D.'s parents most heavily rely, 20 U.S.C. § 1414(a)(1)(D), says only that the school must get the parents' informed consent before providing services under the IDEA, not that a lack of consent will permit them to blow past the exhaustion requirement. *See id.* § 1414(a)(1)(D)(i)(II), (ii)(II). Accordingly, we conclude that Palmyra was entitled to summary judgment.

## III.

We affirm the judgment of the district court.

_____